# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ERNIE HAIRE FORD, INC.,**
                              **Plaintiff,**

**-vs-**                                        **Case No.  6:07-cv-288-Orl-28DAB**

**UNIVERSAL UNDERWRITERS**
**INSURANCE COMPANY,**
                              **Defendant.**
_____/
                                        **Consolidated with**

**CROWN AUTO DEALERSHIPS, INC.,**
                              **Plaintiff,**

**-vs-**                                        **Case No. 6:07-cv-595-Orl-28DAB**

**UNIVERSAL UNDERWRITERS**
**INSURANCE COMPANY,**
                              **Defendant.**
_____/

# ORDER

Two automobile dealers – Plaintiffs Ernie Haire Ford, Inc. ("Ernie Haire") and Crown

Auto Dealerships, Inc. ("Crown") – brought the instant lawsuits against their liability insurer,

Defendant Universal Underwriters Insurance Company ("Universal").  Each Plaintiff filed a

declaratory judgment action regarding the amount of coverage available in connection with

class action lawsuits that were filed against them in other courts, and the cases have been

consolidated.  Counts I and II filed by each Plaintiff have already been disposed of,[1] but

Count III of Crown's Second Amended Complaint (Doc. 39) remains pending.  In that count,

_____

[1]Count II was voluntarily dismissed, and Count I was addressed on the parties' cross-
motions for summary judgment.  (See Order, Doc. 95).

Crown alleges that Universal breached its duty to defend Crown in the class action.

This case is now before the Court on Universal's Motion for Summary Judgment as to Count III (Doc. 82), in opposition to which Crown has filed a Memorandum in Response (Doc. 87). Having considered the parties' submissions, the Court concludes that Universal's motion must be granted.

## I. Background[2]

In September 2003, a putative class action lawsuit was filed against Crown in state court in Hillsborough County, Florida. The plaintiffs in that suit alleged that Crown had violated the Federal Truth-in-Lending Act ("TILA"), the Florida Deceptive and Unfair Trade Practices Act, and the Florida Motor Vehicle Retail Sales Finance Act by not making adequate disclosure of dealer-installed products in connection with automobile sales to consumers. Initially, the class action complaint was not served on Crown; instead, counsel for the class action plaintiffs provided a copy to Crown's corporate counsel, James Goodwin of the Tampa law firm of MacFarlane Ferguson, and Goodwin attempted to resolve the suit. However, those attempts were unsuccessful, and on January 16, 2004 the class action plaintiffs amended their complaint and served Crown with it a week later. At that point, Crown tendered the First Amended Complaint ("the Class Complaint") to Universal. The TILA claims in the class action implicated the Statute and Title Errors and Omissions ("STEO") coverage in the insurance policies Crown had obtained from Universal.

---

[2]The Background section is taken largely from the Statement of Facts in Universal's Motion for Summary Judgment (Doc. 82), which Crown, for the most part, has not challenged.

Shortly after receiving the Class Complaint, Universal appointed Mark Kapusta of the

Sarasota office of the Law Office of Bohdan Neswiacheny to represent Universal in

defending the suit.  This appointment was reflected in a letter from Universal to Crown dated

February 2, 2004 that stated in part:

> . . . We have referred this case to Mark R. Kapusta, Esq., Law
> Office of Bohdan Neswiacheny, P.A., . . . for defense of this
> action, who will defend this case on your behalf in accordance
> with all the terms and conditions of the policy you have with our
> company.
> We are accepting this matter under a full reservation of rights,
> because we have limited information relative to the allegations
> in the Complaint and are unable to determine at this time
> whether or not there is coverage available under your policy. . .
> .
> . . . .
> At the present time, we are providing Statute and Title E & O
> coverage for this claim under Coverage Part 500.  The Insuring
> Agreement states that "we will pay all sums the insured legally
> must pay as damages because of Statute and Title E & O when
> such insurance is included in the declarations.  We have the
> right and duty to defend any suit asking for damages.  We may
> investigate and settle any claim or suit we consider appropriate.
> Our payment of the limit shown in the declarations ends our duty
> to defend."
> You have an aggregate limit of $500,000[] with respect to this
> coverage part that is available for the sum of all damages and
> settlements involving Statute and Title E & O claims. . . .
> Please note that Exclusion (a) exempts coverage for Statute and
> Title E & O, if caused by any intentional or criminal act
> committed by an Insured.  Should Universal Underwriters learn
> of any information developed documenting an intentional or
> criminal act on the part of any Insured, Statute and Title E & O
> coverage will cease.  By referring this case for handling this
> company is not waiving any rights to deny coverage at a later
> date.
> . . . .
> It is of vital importance for you to note that this suit involves 13
> separate dealerships with a potential class of 15,000-18,000
> members.  It is possible that the plaintiff could receive an award

in excess of the policy limits of $500,000.  The magnitude and scope of this case strongly suggests that it will not be resolved without substantial contribution from Crown Auto Dealerships. Because of this you may wish to retain your own counsel to associate with the counsel we have retained to represent your excess exposure in this litigation.  You are responsible for such counsel's fees.

(Letter from Universal to Crown, Feb. 2, 2004, Ex. 3 to Thomas Schmidt Dep., Doc. 78).

Upon his appointment, Kapusta wrote to Crown:

At the request of Universal Underwriters Group[,] your insurer, this law firm will be providing you with a defense in connection with the [class action lawsuit].
. . . .
As an insured who is being provided a defense by your insurance company, you have certain legal rights regarding such representation.  For you[r] reference, I am enclosing a Statement of Insured Client's Rights.  Do not hesitate to contact the undersigned directly if, after reading this statement, you have questions regarding those rights.

(Letter from Kapusta to Thomas Schmidt of Crown, Jan. 28, 2004, Ex. 4 to Schmidt Dep.).[3]

---

[3]The "Statement of Insured Client's Rights" that was attached to Kapusta's letter provides in part:

An insurance company has selected a lawyer to defend a lawsuit or claim against you.  This Statement of Insured Client's Rights is being given to you to assure that you are aware of your rights regarding your legal representation.  This disclosure statement highlights many, but not all, of your rights when your legal representation is being provided by the insurance company.

1.  *Your Lawyer.*  If you have questions concerning the selection of the lawyer by the insurance company, you should discuss the matter with the insurance company and the lawyer.  As a client, you have the right to know about the lawyer's education, training, and experience.  If you ask, the lawyer should tell you specifically about the lawyer's actual experience dealing with cases similar to yours and give you this information in writing, if you request it.  Your lawyer is responsible for keeping you reasonably informed regarding the case and promptly complying with your reasonable requests for

-4-

In early February 2004, Crown retained other counsel – the Miami law firm of Pathman Lewis LLP ("Pathman Lewis") – to, in addition to Kapusta, represent it in the class action.   (See Letter from Alex Kurkin of Pathman Lewis to James Myers of Crown, Feb. 11, 2004, Ex. 14 to Schmidt Dep.).

─────────────────────

information. . . .
. . . .

6. *Conflicts of Interest.*  Most insurance policies state that the insurance company will provide a lawyer to represent your interests as well as those of the insurance company.  The lawyer is responsible for identifying conflicts of interest and advising you of them.  If at any time you believe the lawyer provided by the insurance company cannot fairly represent you because of conflicts of interest between you and the company (such as whether there is insurance coverage for the claim against you), you should discuss this with the lawyer and explain why you believe there is a conflict.  If an actual conflict of interest arises that cannot be resolved, the insurance company may be required to provide you with another lawyer.

7. *Settlement.*  Many policies state that the insurance company alone may make a final decision regarding settlement of a claim, but under some policies your agreement is required.  If you want to object to or encourage a settlement within policy limits, you should discuss your concerns with your lawyer to learn your rights and possible consequences.  No settlement of the case requiring you to pay money in excess of your policy limits can be reached without your agreement, following full disclosure.
. . . .

9. *Hiring Your Own Lawyer.*  The lawyer provided by the insurance company is representing you only to defend the lawsuit.  If you desire to pursue a claim against the other side, or desire legal services not directly related to the defense of the lawsuit against you, you will need to make your own arrangements with this or another lawyer.  You also may hire another lawyer, at your own expense, to monitor the defense being provided by the insurance company.  If there is a reasonable risk that the claim made against you exceeds the amount of coverage under your policy, you should consider consulting another lawyer.
. . . .

IF YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS,
PLEASE ASK FOR AN EXPLANATION.

(Statement of Insured Client's Rights, Attach. to Ex. 4 to Schmidt Dep.).

Soon after being selected as counsel to represent Crown, Kapusta engaged the services of an expert, Gil Van Over, to assess the potential damages in the class action lawsuit.  In a report to Kapusta dated April 2, 2004, Van Over estimated damages ranging from $624,105 to $974,900.  (Van Over Report, Apr. 2, 2004, Ex. 24 to Schmidt Dep., at 3).  Meanwhile, Pathman Lewis estimated potential damage exposure as of March 9, 2004 at nearly $44 million.  (Memorandum from Alex Kurkin of Pathman Lewis to James Myers of Crown, Mar. 9, 2004, Ex. 72 to Myers Dep., at 1).  Thus, quite early in the lawsuit, even the most conservative damages estimate exceeded Universal's professed[4] coverage limit of $500,000.  (See, e.g., Myers Dep. at 74-75).

The class action suit was mediated on July 27, 2004, but no settlement was reached at that time; Universal had offered its policy limits of $500,000 toward settlement at that point and Kapusta recommended settlement, but all of the class action plaintiffs' demands for settlement in that first mediation exceeded $500,000.[5]  (See Letter from Universal to Crown,

---

[4]A dispute arose in early 2007 between Crown and Universal regarding whether Crown was in fact limited to $500,000 of coverage under its policies with Universal.

[5]Moreover, as a matter of principle Crown was not interested in settling the case at that point; Crown did not believe that it had done anything wrong, and it felt that settling – even within the policy limits, with nothing out of pocket to Crown – would send a bad message.  (See, e.g., Myers Dep. at 26-27 ("[W]e felt we were right. We didn't think that we had done anything wrong . . . . [W]e didn't want to be looked at as an easy target . . . . We were concerned about that kind of a reputation. . . . [W]e were very upset, very angry. . . . So for all those reasons, we didn't want to settle."); id. at 27-28 (stating that Crown chose not to even offer the $500,000 policy limits at the 2004 mediation because "this was early in the case, and we still didn't understand what the basis was for the complaint" and Crown "didn't see there being a basis for offering $500,000"); id. at 29 (Myers "appreciated the fact that [Universal] was going to offer up that money that they felt was our policy limit at that point if we wanted to make a settlement . . . [b]ut [Myers] didn't see any reason whatsoever" to settle it for $500,000 at that point); id. at 112 ("[W]e believed we were right" and were "intent

Aug. 2, 2004, Ex. 32 to Schmidt Dep.).  A major impediment to settlement even at that early

stage of the case was the amount of attorneys' fees sought by the plaintiffs.  After the July

2004 mediation, Kapusta estimated that a monetary contribution from Crown of between

$100,000 and $150,000 – above and beyond the $500,000 policy limits that Universal would

provide – would be required to settle the case.  (Letter from Kapusta to David Koestner at

Universal, July 28, 2004, Ex. 31 to Myers Dep.).  A second mediation was held in March

2005, but no settlement was reached at that time either.[6]  In a letter following that mediation,

Kapusta wrote to Universal:

> The largest stumbling block to settlement remains the
> attorney fees claimed by class counsel.  The last offer by the
> defense was a total settlement of all claims, including attorneys

_____

on proving that, and ultimately we might have proven it"); Schmidt Dep. at 25 ("[W]e felt we didn't do anything wrong. . . . [W]e weren't going to contribute anything in excess of the $500,000 that they said the policy limit was because we didn't do anything wrong.  I mean, that's our opinion.  That was our opinion then, that's our opinion today, even though it's settled."); id. at 39 ("Our position [regarding settlement in 2004] was that we're not going to – again, we didn't feel like we did anything wrong. . . . [W]e were not going to pay anything – we were not going to contribute to any settlement amount over and above the policy limit and, furthermore, we did not believe that settling this case for the policy limit would have been in our best interest."); id. at 86 (stating that the 2004 mediation was unsuccessful because the plaintiffs "wouldn't agree to come anywhere near the policy limit of $500,000, and we were not . . . we didn't feel that we should have to pay anything in this suit."); id. at 87 ("[F]rom the start we felt that settling this thing for the policy limit, even though we wouldn't have to come out of pocket, would have been a detriment to Crown going forward . . . . We didn't feel that [settling it for $500,000] . . . was in our best interest . . . .")).

    [6]Crown's position as to settlement was essentially the same in 2005 as it had been in 2004.  (See Schmidt Dep. at 39 ("The same position.  We were not going to . . . we didn't feel that we had an obligation to pay any money in this case.  And we – that was our position."); id. at 122 ("[W]e were more inclined to settle the case in '05 than we were in '04 just because of the way that the suit progressed. . . . [O]ur posture on coming out of pocket never did change.  We didn't want to come out of pocket.  Again, we didn't feel like we did anything wrong.")).

> [sic] fees, for $585,000.00.  The attorneys for the class refused
> to negotiate at all on the attorneys [sic] fees issue.  Their last
> demand was $175,000.00 to settle the class ETCH claims only
> (limited release), plus the defense would bear the cost of class
> administration and the court would decide the fees.

(Letter from Mark Kapusta to David Koestner at Universal, Mar. 18, 2005, Ex. 42 to Myers Dep.).

In late 2005, the class plaintiffs filed a motion for Rule 11 sanctions against both Pathman Lewis and Crown based on Pathman Lewis's alleged improper communication with a consultant for the plaintiffs.  In late 2005 or early 2006, Crown decided that Pathman Lewis would no longer represent Crown; although Crown did not have a problem with Pathman's work, Crown felt that its interests would be better served if Pathman no longer worked on the case due to the court's possible perceptions of Pathman Lewis after the sanctions issue arose.  (See Myers Dep. at 41-42).  Crown then retained the Carlton Fields law firm to replace Pathman Lewis.

The class was certified in 2006, shortly after Carlton Fields became involved in the case. (See Myers Dep. at 31).  The class consisted of 1,473 members.  Ultimately, the class action settled in September 2007[7] for a total of over $1.1 million.  Pursuant to the settlement, the 1,473 class members were to share $310,000 and the class counsel received $825,000 in fees and costs.  Administrative costs and additional monies for the class representatives added another $49,500.  (Schmidt Dep. at 151-52).

---

[7]As stated by Crown's CFO, nothing had really changed between 2005 and 2007 with regard to Crown's feelings toward settlement.  (Schmidt Dep. at 40).  Crown still did not believe it had done anything wrong, but the case had gone on for a long time and Crown didn't think it was going to win; therefore, it decided to settle in 2007.  (Id. at 40-42).

-8-

Meanwhile, Crown had filed this lawsuit against Universal on March 16, 2007 in the circuit court in and for Seminole County, Florida; the case was removed to this Court on April 10, 2007.  (Docs. 1 & 2 in Case No. 07-cv-595).  In its Second Amended Complaint (Doc. 39), Crown alleged three counts.  The second count was voluntarily dismissed, and the first count sought a declaration as to the amount of coverage available to Crown under its policy with Universal.  This Court has already ruled on Count I, concluding that the Universal policies potentially provided coverage to Crown up to the "per suit" limits for each of the five policy periods within the class period – limits of $500,000 for each of the first three policy years, and $25,000 for each of the last two policy years.  (See Order, Doc. 95).  The Court rejected Universal's contention that only one policy period's limits – a total of $500,000 – was available to Crown.  (Id.)

In the only remaining count, Count III of Crown's Second Amended Complaint, Crown alleges that:  "Universal had a duty to provide a reasonable defense to Crown in the underlying Class Action" (Doc. 39 ¶ 19); "Universal breached that duty by failing to provide sufficient resources for a fully adequate defense of Crown in the underlying Class Action" (id. ¶ 20); "Universal breached that duty by failing to appropriately investigate the underlying claim and undertaking legally sufficient [sic] efforts to settle the underlying claim in a manner consistent with its fiduciary obligations to Crown" (id. ¶ 21); and "[a]s a result of the breach of the duty to defend, Crown was forced to engage the services of its own attorneys to defend Crown in the underlying Class Action" (id. ¶ 22).  As damages for breach of the duty to defend, Crown seeks "all consequential damages arising as a result of [Universal's] failure to defend, investigate and settle the Underlying Class Action and all reasonable costs and

attorneys' fees incurred by it in defending itself against the Underlying Class Action" (id. ¶ 23). Crown estimates these fees and costs at in excess of $900,000. (See Joint Pretrial Statement, Doc. 96, at 13-14).

### II. Other Motions Filed After the Instant Summary Judgment Motion

Before turning to the merits of Universal's motion for summary judgment on the breach-of-duty-to-defend claim, the Court shall briefly address several other motions that the parties have since filed. These motions include: (1) Universal's Motion to Strike Certain Claims in Plaintiff's Response to Defendant's Motion for Summary Judgment as to Count III (Doc. 92), to which Crown has responded with (2) Plaintiff's Motion to Strike (Doc. 93) Defendant's Motion to Strike; (3) Universal's Motion for Entry of Judgment (Doc. 97), to which Crown has filed a Response (Doc. 109); and (4) Universal's Motion to Abate or Stay and/or to Strike Crown Auto Dealerships, Inc.'s Newly Asserted Claims or, Alternatively, for Leave to Amend Defendant's Answer (Doc. 105), in opposition to which Crown has filed a Response (Doc. 111).

Universal's motions (Docs. 92, 97, and 105) are based on a concern by Universal that Crown is raising new "claims" in its summary judgment response and in the joint pretrial statement. However, Crown cannot assert new "claims" absent permission of the Court. Crown has only one pending claim – Count III of the Second Amended Complaint. To the extent Universal challenges the evidence or argument that Crown can use or make in support of its claim, the Court has taken Universal's arguments into consideration in ruling on the summary judgment motion that is pending with regard to Count III; insofar as the

Court has done so, the Court construes – and accepts – Universal's Motion to Strike Certain Claims in Plaintiff's Response to Defendant's Motion for Summary Judgment as to Count III (Doc. 92) as a reply to Crown's summary judgment response.  Both parties' motions to strike (Docs. 92 & 93) are denied.

Because Crown has not been given leave to assert any new "claims," Universal's motion to abate or stay any such claims or for leave to file an amended answer to respond to such claims (Doc. 105) is denied.  Finally, while the Court recognizes that Plaintiffs do not oppose Universal's motion for entry of judgment under Rule 54(b) (Doc. 97) (at least so long as the judgment is entered as to both Crown and the other Plaintiff in this consolidated matter, Ernie Haire Ford), this motion is mooted by the instant Order, which grants Universal's motion for summary judgment on Count III.  Judgment will be entered as to the entire case following entry of this Order; thus, entry of a partial judgment is not necessary.

### III.  Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issues of material fact remain.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, summary

judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine.  That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

### IV.  The Duty to Defend

"'[A]n insurer's duty to defend arises solely from the language of the insurance contract.'"  Underwriters Guar. Ins. Co. v. Nationwide Mut. Fire Ins. Co., 578 So. 2d 34, 35 (Fla. 4th DCA 1991) (quoting Carrousel Concessions, Inc. v. Fla. Ins. Guar. Ass'n, 483 So. 2d 513, 516 (Fla. 3d DCA 1986)).  "To satisfy its obligation to defend, an insurer . . . must provide an *adequate* defense.  Where the insurer acts negligently in performing its duty to defend on behalf of the insured, its conduct constitutes a breach of contract."  Carrousel, 483 So. 2d at 516 (citations omitted).

-12-

"If the insurer breaches its duty to defend, it – like any other party who fails to perform its contractual obligations – becomes liable for all damages naturally flowing from the breach." Id.  "If [an insured] is able to establish that the defense supplied by [its insurer] was inadequate and that it was reasonable for [the insured] to engage the services of its own attorneys, [the insured] will be entitled to recover all reasonable costs and attorneys' fees incurred at the trial level." Id. at 517.  "The mere fact that [the insured] retained its own attorneys, however, does not of itself prove that [the insurer] failed to fulfill its duty to defend." Id.  Rather, "[a] liability insurer is not required to pay the insured's expenses unless the actions of the insurer have 'forced' the insured to engage its own attorneys." Id.

## V. The Merits of Universal's Motion

Universal argues that there is no genuine issue of material fact remaining as to whether, as a matter of law, it breached its duty to defend.  Crown contends in response that five "disputed material facts" preclude summary judgment.  However, Universal is correct; it has presented a properly supported motion – abundantly supported by the record, including the testimony of Crown's own officers – and the purported factual issues raised by Crown in response do not avoid summary judgment.

In its motion, Universal addresses each of the specific allegations made in Count III of Crown's Second Amended Complaint – that Universal breached its duty to defend: "by failing to provide sufficient resources for a fully adequate defense of Crown"; "by failing to appropriately investigate the underlying claim"; and by "undertaking legally [in]sufficient efforts to settle the underlying claim."  In its response, Crown does not really challenge the

evidence Universal relies upon, instead asserting five other purported reasons that Universal allegedly breached its duty to defend.[8]  Crown argues that a reasonable jury could find that Universal breached its duty to defend based on any one of the following:  (1) Universal's "instructions" in its February 2, 2004 Reservation of Rights Letter and Universal's actions pursuant thereto; (2) inadequate experience of appointed counsel; (3) Universal's allowance or encouragement of a conflict of interest that jeopardized coverage; (4) Universal's failure to defend Crown on a Rule 11 motion; and (5) the alleged inextricable intertwinement of the issue of policy limits and the duty to defend.  However, Crown's contentions that it was "forced" to retain private counsel to protect its interests are not borne out by the record, and none of the alleged disputed facts supports a finding of a breach of Universal's duty to defend.  Crown's contentions are addressed in turn.

   1. *The Reservation of Rights Letter*

   Crown first asserts that Universal breached its duty to defend through the Reservation of Rights letter it sent to Crown and the defense it provided thereunder.  Crown contends that in that letter, Universal "instructed" or "advised" Crown to retain its own private counsel to represent it.  (See, e.g., Doc. 87 at 5, 7).  However, Crown quotes the letter out of context.  The letter – which speaks for itself – did not instruct Crown to hire separate counsel at its

---

[8]It is no wonder that Universal was surprised by Crown's summary judgment response and moved to strike it.  Much of Crown's response raises points that differ from the allegations of Count III and, at times, from the deposition testimony of Crown's officers; instead, Crown's response presents alternative theories of the breach of the duty to defend. The Court need not, however, parse the theories that Crown may appropriately pursue; even considering all of Crown's arguments, the Court finds no breach of the duty to defend by Universal.  To the extent further comment on Crown's cited evidence or theories is warranted, such comment is made in the discussion in the text.

own expense.  Instead, it informed Crown that it "may wish" to retain its own counsel due to the possibility of an excess judgment.  Although Crown asserts that it "took Universal at its word and understood the instruction as a requirement to have its private counsel represent Crown for all amounts of excess exposure," the letter does not provide an "instruction" or requirement.

The policy provides that Universal's duty to defend ceases upon payment of the policy limits – a legitimate contractual limitation that Universal was entitled to include in the policy, and one which has been recognized as valid in Florida.  See Underwriters Guar. Ins. Co. v. Nationwide Mut. Fire Ins. Co., 578 So. 2d 34, 35 (Fla. 4th DCA 1991) (noting that the duty to defend arises solely from contact and that because "the policy provide[d] that Nationwide is relieved of its duty to defend 'any suit' once it has paid in its policy limits . . . Nationwide was not obligated by its contract to continue defending the additional insured after payment of its policy limits in settlement for its named insured").  Thus, Universal did what it should have done in advising Crown of the possibility of an excess judgment for which there would be neither coverage nor defense; indeed, Universal may have been remiss not to have done so.  Cf. 14 Couch on Insurance 3d § 202:18, at 202-58 (West/Thomson 2007) ("Cautious practice contemplates that even were there is no possibility of a verdict in excess of the policy limits, a liability insurer which is contemplating refusing to indemnify should advise the insured to secure competent counsel of his or her choice so as to avoid the risk that the insured might suffer an injury by reason of being denied insurance coverage after an injury trial or settlement.").

Moreover, as acknowledged by Crown's officers, at no time did Universal or the

counsel it appointed fail to defend the "whole suit"[9]; Universal merely informed Crown of the

possibility of an excess judgment[10] and of Crown's option to hire other counsel at its own

expense.  Crown decided to pursue this course.  The Court also rejects Crown's assertion

that Universal's "instruction to Crown to retain private counsel" was "deceptive."  (See Doc.

87 at 7).[11]

    As another court in this district explained in a similar case, "[i]t is . . . well settled that

an insurer does not breach its duty to defend by offering to defend only under a reservation

of rights.  However, when an insurer offers to defend under a reservation of rights, Florida

law provides that an insured may, at its election, reject the defense and retain its own

attorneys without jeopardizing its right to seek indemnity from the insurer for liability."

Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc., 344 F. Supp. 2d 1358, 1370 (M.D. Fla.

2004) (Hodges, J.) (footnotes omitted).  The Royal Oak court rejected the insured's claim

that it was entitled to recover from the insurer the fees and costs of independently retained

---

[9](See, e.g., Myers Dep. at 32).

[10]Although the Reservation of Rights letter noted the policy limits of $500,000 and the possibility of an excess judgment, Universal reserved its rights with regard to coverage exclusions – not the policy limits issue.  Universal reserved its right to deny coverage based on intentional or criminal acts by Crown; no evidence of any such acts ever appeared, and the coverage exclusions never became an issue in the case or in the defense thereof.

[11]Additionally, contrary to Crown's contention – citing this letter – that "prior to any investigation whatsoever, Universal 'strongly' suggested the case 'will not be resolved without substantial contribution from Crown," (Doc. 87 at 5), Universal does not state this in the letter.  Universal duly reports that the size of the case suggested that an excess judgment was possible.  Moreover, while this statement was made very early in the case, the potential number of deals had been ascertained at that point (see Mari Ann Tobin Dep. at 78), and there was no impropriety in informing Crown of a potential worst-case scenario based on the information that Universal had at that time.

counsel.  The court reiterated that "a defense under a reservation of rights, by itself, is not a breach of the duty to defend."  Id. at 1371.  Additionally, "even if fees and costs are appropriate where an insured rejects a defense under a reservation of rights, the insured must actually *reject* that defense."  Id.  Such a rejection was not made in Royal Oak; nor was it made here.  (See, e.g., Schmidt Dep. at 165 (stating that Crown never rejected the defense being offered by Universal)).

Crown further contends that it was entitled to "choice of counsel" to defend it and that via the letter Universal deprived Crown of this right.  However, the cases cited by Crown in this regard in a footnote of its memorandum[12] do not support Crown's asserted "judicially-created right" to counsel of its choice at Universal's expense.  Additionally, Crown's CFO agreed in his deposition that "under the policy . . . Universal had the right to select defense counsel." (Schmidt Dep. at 154).  In any event, Crown never complained about Kapusta, raised any questions about his capabilities, or expressed dissatisfaction about him in any way; thus, there is no basis to conclude that Kapusta was not acceptable to Crown.[13]  In sum, the Reservation of Rights letter does not support Crown's claim of breach of the duty to defend.

2. *Experience of Appointed Counsel*

Next, Crown argues that it was "forced" to retain its own counsel because of the alleged inexperience of the attorney retained on its behalf by Universal.  Crown contends

_____

[12](See Doc. 87 at 6 n.3).

[13]Indeed, Kapusta has defended Crown in other cases – both before and since the class action at issue here.  (See, e.g., Schmidt Dep. at 126-29).

that "[a] reasonable jury could conclude that Kapusta . . . had inadequate experience to be lead defense counsel in a class action lawsuit." (Doc. 87 at 8). This argument is not well-taken.

Crown asserts that Kapusta had never participated in a class certification hearing[14]; had only been principally responsible for one class certification motion; was unfamiliar with class settlement devices, including coupons; and lacked appellate experience. Crown also contends that the defense was inadequate because Universal "did not provide lead counsel for the case." (Doc. 87 at 11).

However, Crown's contentions do not establish or create an issue as to Kapusta's competence to handle the case, especially considering that Crown's theory is based on assumptions and that Crown never questioned or complained about Kapusta's experience or competence. Crown does not dispute that: "At the time of his retention as Crown's defense counsel, Mr. Kapusta had 15 years of experience as an attorney, including more than eight years of experience representing automobile dealers, experience in dealing with similar class action complaints against other dealerships and experience litigating against the plaintiffs' attorneys. Other members of the Law Offices of Bohdan Neswiacheny also had experience with consumer class actions against automobile dealerships." (Joint Pretrial Statement, Doc. 96, at 19).

_____

[14]There apparently never was a class certification hearing in this case. (See, e.g., Myers Dep. at 102 ("And I was also very frustrated and disappointed that in the class certification, knowing that we weren't able to have an oral argument, . . . if that's the right term, but a chance to have a hearing in front of the judge. It was just ruled upon based upon the filings.")).

Crown's assertion that Kapusta was not sufficiently experienced or otherwise adequate to handle its case without Crown's separately-retained counsel is nothing more than speculation.  Crown asserts that it would not have been possible for Kapusta or any single attorney to defend the case against the five lawyers representing the class plaintiffs. Crown's COO testified in his deposition that Kapusta was not negligent but "he would have been negligent had [Crown] not hired our own counsel to lead the defense." (Myers Dep. at 12).  Neither the COO, James Myers, nor the CFO, Thomas Schmidt, however, was aware of how many other attorneys worked at Kapusta's law firm or what resources Kapusta had available to him if necessary; they simply never inquired about it.  (See Myers Dep. at 10, 43; Schmidt Dep. at 16-17, 155).

Moreover, Crown's attempt to cast blame on Universal or Kapusta for Kapusta "not taking the lead" is rejected.  As Crown itself notes, Crown "did not consider Kapusta as lead counsel." (Doc. 87 at 11).  Crown made the choice to have Pathman Lewis "take the lead," and they cannot now fault Universal or Kapusta for Kapusta playing the role that Crown or Pathman Lewis instructed him to play in the case.  (See, e.g., Myers Dep. at 22 ("[F]rom the onset I gave instructions to both Pathman Lewis and Mark Kapusta that I wanted Mark Kapusta to do as much as he could in the case and *I would like Pathman Lewis to allow Mark* to do as much as he would in the defense of the case . . . .") (emphasis added); id. at 135 (Pathman Lewis "said there were certain things they felt like they were better suited to do and kind of asked that they be able to do those things," and Myers approved Pathman Lewis's request); id. (Myers "wanted to have some control over who was doing what and what was being done, period, in the case, since we were paying for Pathman's work");

Schmidt Dep. at 66 (Pathman Lewis took the lead in determining what needed to be done); id. at 72 ("Pathman Lewis took the lead in developing most of the strategy, and drafting the motions . . . We didn't object to it at the time."); id. at 161 (Schmidt "never questioned Mr. Kapusta about why he was not spending more time on the case"); id. at 163 (Pathman Lewis and Carlton Fields "assumed the lead and Mark [Kapusta] assumed second").

Crown made the choice for Pathman Lewis to be "lead counsel" without ever asking Kapusta about the possibility of assistance from other lawyers at his firm.  Additionally, Crown did not object – and indeed agreed with – a statement by Pathman Lewis just after the first mediation in July 2004 that to the extent the case involved more than the $500,000 policy limits, negotiation was up to Crown and its "personal counsel," Pathman Lewis, only. (See Myers Dep. at 25,110; Schmidt Dep. at 95; Letter from Roger Slade of Pathman Lewis to David Koestner of Universal, Aug. 5, 2004, Attach. to Ex. 33 to Schmidt Dep. ("[T]o the extent that any contribution to the settlement may exceed those policy limits, this is something that our client is entitled to negotiate separately through its personal counsel. Feel free to address Universal's contribution to the settlement as you deem appropriate; however, I ask that you leave an analysis concerning the payment of any excess, above and beyond the policy limits, to myself and my client.")).

Crown's CFO and COO testified in their depositions that they regarded Kapusta as a good attorney and that they did not ever complain about or question his qualifications. (See, e.g., Myers Dep. at 24 (Crown COO acknowledging that he never "express[ed] any sentiment to Universal that Mr. Kapusta did not have the type of experience that [he] felt he needed"); id. at 63 (Myers never expressed any concern to Kapusta about his experience

level); Schmidt Dep. at 37 (Crown CFO was "sort of" satisfied with Kapusta's qualifications, but Crown "decided pretty much from the start . . . after we got the letter from Universal that we would have to retain other counsel to protect our excess interest"); id. at 37-38 (Schmidt never expressed concern to Universal or to Kapusta about Kapusta's qualifications); id. at 155 (never objected that the Bohdan Neswiacheny firm was too small to handle the defense or that Kapusta was too inexperienced)).

In sum, the record evidence does not support Crown's assertions that anything that Universal or Kapusta did forced it to hire separate counsel.  (See, e.g., Schmidt Dep. at 43 (Crown "felt obligated to hire personal counsel . . . [b]ecause . . . [Crown had] never been involved in a class action lawsuit before"); id. at 61 (stating that Kapusta did not do anything between the time that he was retained and the time Crown retained Pathman Lewis that forced Crown to retain private counsel, but the letter from Universal told Crown to do so); id. at 167 (there was never "a time during the [class action] litigation where Crown was dissatisfied with the service being provided by Mr. Kapusta")).  Universal did not breach its duty to defend by appointing Kapusta to defend Crown.

### 3.  Conflict of Interest

Crown next contends that genuine issues of material fact exist regarding whether Universal "allowed [appointed counsel] to create a conflict of interest which jeopardized coverage under the insurance policy[] and failed to advise Crown" of the conflict.  (See Doc. 87 at 12).  Crown asserts that Kapusta "took affirmative actions which created an actual conflict of interest which affected his representation of Crown." (Id. at 14).  Further, Crown avers that "Kapusta singularly, or in participation with co-counsel [i.e., Crown's privately

retained counsel, Pathman Lewis], filed four motions to dismiss the plaintiffs' complaints, including motions to dismiss" the TILA counts.  (Id. at 14).  Crown argues that by moving to dismiss the TILA counts Kapusta "elevated the interests of the insurer over those of his client, the insured."  (Id. at 15 (citing Royal Oak, 344 F. Supp. 2d at 1374)).

As an initial matter, the Court agrees with Universal that Crown should not be permitted to pursue this argument in support of its claim for breach of duty to defend. Universal deposed both Thomas Schmidt, Crown's CFO, and James Myers, Crown's COO, as Crown's Rule 30(b)(6) representatives during discovery on this claim, and they did not assert a conflict of interest in Kapusta's representation.  (See, e.g., Schmidt Dep. at 38 (stating that Kapusta never acted contrary to Crown's interest); id. at 39 ("Q. Does Crown contend now that there was ever a conflict of interest in Mr. Kapusta's representation of Crown?  A.  I don't believe so."); id. at 159 (nothing "ever happen[ed] to indicate to Crown that Mark Kapusta was not loyal to Crown," and Schmidt "does not believe" that "Crown ha[s] any reason to believe that Universal attempted to influence Mark Kapusta in such a way that Crown was disserved"); Myers Dep. at 195 ("Q.  Do you have any reason to believe that Mark Kapusta at any time did not exercise independent professional judgment on behalf of Crown?  A.  I believe he always exercised his best efforts, his best judgment on our behalf.")).

In any event, however, this assertion is without merit.  In Royal Oak, Judge Hodges determined – as a matter of first impression under Florida law, and making a prediction as to how the Florida Supreme Court would rule – that a potential conflict of interest is not enough to warrant payment by the insurer of an insured's separately-retained counsel.

-22-

Judge Hodges stated:

> Not only did Travelers have the duty to defend Royal Oak against the Tilton action, but it also had the right to defend. The right to control the defense is "a valuable one in that it reserves to the insurer the right to protect itself against unwarranted liability claims and is essential in protecting its financial interest in the outcome of litigation." This meaningful contractual right should not be penalized merely because there exists the potential for insurer-selected counsel to become impermissibly conflicted in its representation. To so hold would require this Court to recognize a conclusive presumption, based on nothing more than the existence of a potential conflict between the insured and the insurer, that counsel is unable to provide independent representation. The Court is not willing to grant such an unwarranted presumption into the law. Instead, there must be some evidence to suggest that the conflict between the insurer and the insured actually affected counsel's representation so that it may be said that counsel's actions elevated the interests of the insurer over those of his client, the insured.
>
> . . . .
>
> In this case . . . there is no evidence to suggest that the conflict between Travelers and Royal Oak interfered with [appointed counsel's] representation of Royal Oak. [Appointed counsel] recognized that his loyalty was to Royal Oak, and nothing indicates that [he] was unable to represent his client in accordance with the professional standards for independence. There is no evidence that Travelers attempted to influence [his] professional judgment in such a way that Royal Oak's interests were disserved. Indeed, in its response to Travelers'[s] reservation of rights letter, Royal Oak never complained that [appointed counsel] acted disloyally and never asked that [he] withdraw from representation. Rather, immediately upon receiving the reservation of rights letter and before responding to it, Royal Oak retained King & Spaulding to "supplement" the defense. Royal Oak was entirely within its rights to do so, but it does not necessarily follow that Travelers should have to pay for it. Travelers['s] obligation was to provide an adequate defense. Nothing suggests that this duty was not fully discharged by [appointed counsel's] conflict-free representation.
>
> The Court is convinced that the rules governing the Florida [B]ar and the attendant threat of malpractice liability

> provide sufficient assurance that counsel appointed by an insurer would not continue to represent an insured in the event that a conflict of interest interfered with counsel's ability to make independent professional judgments on behalf of his client. . . .
>
> A prudent insured would employ some degree of caution when its interests become adverse to those of its insurer, and accordingly, Royal Oak was entirely within its rights to retain counsel at *its own expense.* But the question to be resolved by this Court is whether Florida law requires an insurer to pay for this counsel; it does not.

344 F. Supp. 2d at 1372-75 (footnotes omitted).  In the instant case, as in <u>Royal Oak</u>, there is no evidence that a conflict of interest interfered with Kapusta's representation of Crown.

Crown's assertion that "Kapusta never considered what would happen if the TILA claims were dismissed" ( Doc. 87 at 14) is not supported by the record; Kapusta testified in his deposition that he was aware of the theoretical risk of dismissal of the TILA counts impacting coverage. (Kapusta Dep. at 168).  The motions were directed at all of the counts, not just the TILA counts, and Crown's separately-retained counsel, Pathman Lewis, prepared filings urging the same position.  Moreover, the TILA counts were not dismissed, and neither coverage nor settlement was affected by any of these filings.  Finally, as noted earlier, Crown's officers do not believe Kapusta's judgment or representation was compromised by any conflict of interest.  Crown may not recover fees and costs based on a conflict of interest here.

### 4. Defense of Rule 11 Motion

Crown also contends that Universal breached its duty to defend by not participating in the defense of a Rule 11 motion that was filed against Crown and its privately-retained counsel, Pathman Lewis.  That motion arose from Pathman Lewis's alleged improper

communications with a consultant for the plaintiffs in the class action lawsuit and representations made during a court hearing by Pathman Lewis.  This argument is without merit.

Although Crown asserts that "[r]ecord evidence reveals Universal decided not to provide any defense for the Rule 11 sanctions against Crown," (see Doc. 87 at 18), Crown has not presented evidence controverting the testimony presented by Universal that *Pathman Lewis* wanted Kapusta to stay out of the Rule 11 issue and that Pathman Lewis chose to handle the matter itself.  (See, e.g., Kapusta Dep. at 179 (testifying that Roger Slade of Pathman Lewis "made very clear . . . that his firm was feeling responsible for this, and they . . . wanted to be fully in control of how this was argued and how it was played out in front of the magistrate, so they were going to prepare the response to this motion"); id. at 179-80 ("[T]he Pathman Lewis firm wanted to do it and said they were going to do it and acknowledged that this whole situation was something that had come about because of their actions."); id. at 180 ("Q.  And Mr. Slade gave you an explicit instruction to do nothing in response to this motion?  A.  His words weren't, 'Do nothing.'  His words were, 'Mark, we want to keep you out of this.  This situation has developed as a result of contacts between [the consultant] and my firm.  My firm wants to take on the response and we want to keep you out of this.  So we'll be handling the response both on behalf of the firm and on behalf of Crown."); see also Koestner Dep. at 82 (testimony of Universal's litigation line manager that he never advised Kapusta not to assist Crown with the response to the Rule 11 motion)).  As noted earlier, Crown gave Pathman Lewis the power to direct Kapusta, and with Crown's blessing Kapusta followed Pathman Lewis's instructions throughout the case.  The testimony

as to Crown's officers' "understanding" that Universal did not want Kapusta involved in a Rule 11 issue – an issue that Pathman Lewis brought upon itself and Crown – does not create an issue on this point.  Moreover, the Court can discern no legal basis for requiring an insurer to pay for the defense of allegations that are based, as acknowledged by Crown's COO, solely on the conduct of the insured's independent counsel.  (See Myers Dep. at 123 ("Q. . . . Crown wasn't being charged [in the Rule 11 motion] with any individual conduct aside from the Pathman Lewis conduct; is that true?  A.  I believe that's correct.").  The fact that Pathman Lewis instead of Kapusta handled the Rule 11 issue does not evidence a breach by Universal of the duty to defend.

   *5.  Intertwinement with the Policy Limits Issue*

   Finally, Crown argues that summary judgment on the breach-of-duty-to-defend count is inappropriate because the issue of the duty to defend is "inextricably intertwined" with the issue of the policy limits.  Crown contends that "[if] this Court determines the policy provides $2.5 [m]illion in coverage, rather than $500 [t]housand, a reasonable jury could conclude the case should have settled at mediation within the $2.5 [m]illion policy limits."  (Doc. 87 at 19).  The policy limits issue has already been determined by the Court; after the instant motion for summary judgment on Count III was filed, this Court issued its ruling on the parties' cross-motions regarding the declaratory relief sought by Crown in Count I.  The Court determined that Crown was potentially entitled to the "per suit" limit of each policy period within the class period and not to a single $500,000 limit.[15]

---

   [15]The "per suit" limit was $500,000 for three of the policy periods at issue and $25,000 for the last two policy periods.  (See Order, Doc. 95, at 20-21).  Thus, the Court's

The Court notes that although Crown asserts in its summary judgment response (Doc.

87) that these issues are intertwined, Crown has not been consistent in this position. In a

prior filing, Crown stated:

> [T]he litigation expenses claimed by Crown are not dependent
> on, or even related to, the outcome of the coverage dispute. . .
> . [T]here is no "coverage dispute" to resolve in order to get to the
> breach of the duty to defend claim in this case.  In this case,
> there is no dispute that Universal has an unlimited duty to
> defend under the Policy. The "coverage dispute" concerning the
> amount of available indemnity coverage has nothing to do with
> whether Universal properly defended Crown in the claim, and
> whether the attorneys' fees and costs incurred by Crown [were]
> reasonable, and as a result of Universal's failure to defend.
> Universal's duty to defend was the same regardless of the
> amount of coverage available.

(Crown's Mem. in Opp'n to Def.'s Mot. to Dismiss or Abate and/or Strike, Doc. 47, at 5 & 7).

In any event, the Court disagrees that the coverage issue is intertwined with the duty

to defend issue or precludes summary judgment.  The question of the policy limits has

already been determined in a prior Order, and the resolution of that issue has not had an

impact on the resolution of Count III.  The fact that this Court determined in March 2008 that

Universal was incorrect in its interpretation of the subject policy with regard to policy limits

does not affect whether Universal satisfied its duty to defend in the years 2004, 2005, 2006,

or 2007, especially where Crown did not raise any issue as to the policy limits amount until

early 2007.[16]  "The duty to indemnify is a concept distinct from a duty to defend."  <u>Allstate</u>

_____

determination of a total of  $1.55 million in potential coverage was in between Universal's
assertion of $500,000 and Crown's assertion of $2.5 million.

[16]Crown had not raised any issue as to the amount of coverage prior to that time.
(<u>See, e.g.</u>, Myers Dep. at 174 ("I should have questioned it, I guess, earlier on, but I didn't.");

Ins. Co. v. RJT Enters., Inc., 692 So. 2d 142, 144 (Fla. 1997); accord First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 695 So. 2d 475, 476 (Fla. 3d DCA 1997) ("[A]n insurer's duty to defend is separate and distinct from its duty to indemnify . . . ."). Crown has steadfastly maintained that it is **not** alleging bad faith by Universal. (See, e.g., Crown's Mem. in Opp'n to Def's Mot. to Dismiss or Abate and/or Strike Crown's Alleged Bad Faith Allegations, Doc. 47, at 2 ("These allegations are not bad-faith allegations. Instead, they are allegations that [Universal] has breached its contractual duty to defend Crown.")). Inasmuch as a mistake as to coverage limits is not necessarily sufficient to establish even a bad faith claim,[17] it certainly does not suffice to prove a contractual claim of breach of the duty to defend. Under the circumstances of this case and the pleadings of the parties, the Court's determination of the coverage issue does not bear on the duty-to-defend issue.

## VI. Conclusion

In sum, the Court has reviewed all of the parties' submissions and finds no issue remaining as to whether Universal satisfied its duty to defend. The evidence does not support Crown's contentions that Universal: failed to provide a reasonable defense; failed to provide sufficient resources; failed to appropriately investigate the claim; failed to

---

Schmidt Dep. at 55 (stating that Crown did not contest the issue of the coverage amount with Universal or anyone in 2004); id. at 132 (stating that Crown had "wondered [for some time] *internally* regarding the coverage") (emphasis added); id. at 148 (stating that prior to a February 12, 2007 letter to Universal, he had not questioned coverage)).

[17]See generally 14 Couch on Insurance 3d § 198:6, at 198-15 (Thomson/West 2007) ("[W]here coverage is reasonably debatable, an insurer's decision to deny compensation or a legal defense will not give rise to a bad faith liability, even if hindsight shows that decision was incorrect.").

undertake legally sufficient settlement efforts; misled or otherwise harmed Crown via the Reservation of Rights letter; provided inexperienced counsel; allowed or encouraged appointed counsel to create a conflict of interest; failed to advise of a conflict of interest; or otherwise breached its duty to defend Crown.  Crown cannot now recover fees that it incurred to pay counsel that it elected to retain where the evidence does not support its contention that it was "forced" to do so.

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant's Motion to Strike Certain Claims in Plaintiff's Response to Defendant's Motion for Summary Judgment as to Count III (Doc. 92) is **DENIED**.

2.  Plaintiff's Motion to Strike (Doc. 93) is **DENIED**.

3.  Defendant's Motion for Entry of Judgment (Doc. 97) on the declaratory judgment claims only is **DENIED as moot.**

4. Defendant's Motion to Abate or Stay and/or to Strike Crown Auto Dealerships, Inc.'s Newly Asserted Claims or, Alternatively, for Leave to Amend Defendant's Answer (Doc. 105) is **DENIED**.

5.  Defendant's Motion for Summary Judgment as to Count III (Doc. 82) is **GRANTED**.

6.  All other pending motions are **DENIED as moot**.

7.  The Clerk is directed to enter a judgment in accordance with this Order and in accordance with the Order (Doc. 95) entered on March 28, 2008 regarding Count I.  The judgment shall provide that Plaintiff Crown Auto Dealerships, Inc. shall take nothing from Defendant Universal Underwriters Insurance Company on Count III of the Second Amended Complaint (Doc 39) and that with regard to Count I of the Amended Complaint of Plaintiff

Ernie Haire Ford (Doc. 5) and Count I of the Second Amended Complaint of Plaintiff Crown Auto Dealerships, Inc. (Doc. 39), the rights of the parties are as declared in the Court's March 28, 2008 Order (Doc. 95).  Thereafter, the Clerk shall close this file.

     **DONE** and **ORDERED** in Orlando, Florida this 13th day of May, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party